ASSASSINATION ARCHIVES
& RESEARCH CENTER,
Plaintiff,

v.

CENTRAL INTELLIGENCE
AGENCY, Defendant.

No. Civ.A. 97–2957 (RCL).

United States District Court,
District of Columbia.

Feb. 5, 1999.

Opinion Denying Reconsideration
April 30, 1999.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the Court on defendant Central Intelligence Agency's (CIA) motion to dismiss plaintiff's action for violation of a confidentiality agreement. Upon consideration of the motion, the plaintiff's opposition, the defendant's reply, the record in this case, and the unique policy concerns at issue, the defendant's motion to dismiss will be granted and the plaintiff's action will be dismissed with prejudice.

## I. FACTS

The plaintiff in this action is the Assassination Archives and Research Center (AARC), a nonprofit organization established to promote research on political assassinations and related topics. It maintains one of the world's largest collections of documents relating to the assassination of President John F. Kennedy. The AARC has brought this action under the Freedom of Information Act (FOIA) to compel production by the CIA of certain documents requested by the AARC in July of 1997.

The factual background for this case begins with two other FOIA actions cap-

tioned *Scott v. CIA et al.*, Civil Action 95–686 (D.D.C.) (CRR), and *Scott v. CIA*, Civil Action 96–312 (D.D.C.) (TPJ). The plaintiff in those actions, Michael Scott, filed FOIA requests seeking all documents pertaining to his father, Winston MacKinley Scott, who was Chief of the CIA's Mexico City Station when Lee Harvey Oswald allegedly visited there several weeks before the assassination of President John F. Kennedy. According to the AARC, the elder Scott maintained an unpublished autobiographical manuscript that included chapters on Lee Harvey Oswald and the assassination of President Kennedy, and which was reviewed by the House Select Committee on Assassinations (HSCA) during its investigation of the Kennedy assassination. Allegedly, immediately upon the death of Winston Scott, the CIA sent its chief of counterintelligence to retrieve the manuscript and other documents held by Scott, some of which Michael Scott claimed were personal and family documents, and all of which were removed from the family's possession with no opportunity to copy or sort the information. Representing Michael Scott in his FOIA actions to obtain copies of those documents was Mark Zaid, also counsel for the plaintiff AARC in the case currently before the Court.

In approximately March of 1996, the parties in the Scott actions entered in settlement negotiations. Before the negotiations began, Mr. Zaid and counsel from the CIA and from the Department of Justice (DOJ) signed a confidentiality agreement which reads as follows:

> The parties to the FOIA lawsuit *Scott v. CIA*, 95–686, District Court for the District of Columbia, hereby agree to enter into confidential and privileged settlement negotiations. The parties agree that the nature and extent of the discussions concerning possible settlement will not be disclosed beyond the parties to the lawsuit and counsel without consent of all parties. The parties specifically agree that there will be no public disclosure of these settlement discussions be-

yond a statement that settlement is being or has been discussed.
March 19, 1996 Confidentiality Agreement.

On May 3, 1996, counsel for the CIA and Mr. Zaid again met to discuss the possibility of settling the *Scott* actions. At that meeting, counsel for the CIA provided answers to a number of questions submitted in advance by Mr. Zaid on behalf of Mr. Scott. Among the information disclosed in the CIA's responses was the fact that the documents removed by the CIA following Winston Scott's death had been lawfully destroyed some time before Michael Scott had submitted his FOIA request, and that the destruction was evidenced by certain CIA record destruction orders that were not responsive to the plaintiff's FOIA request but which had been found during additional searches as part of the settlement process. The record destruction orders were not provided to the plaintiff.

Sometime between the March 1996 and May 1996 meetings, counsel for the CIA, Linda Cipriani, became aware that Mr. Zaid had discussed the existence of the record destruction orders with two persons who were not signatories to the March 19, 1996 confidentiality agreement. One of those persons was James Lesar, president of the AARC, the plaintiff in the case now before the Court; the other was Steven Miller. In May of 1996, both by telephone and by follow-up letter, Ms. Cipriani informed Mr. Zaid that the CIA viewed his discussions with Messrs. Lesar and Miller as violations of the confidentiality agreement. In response, Mr. Zaid's letter of May 20, 1996 "unequivocally den[ied] that [he] ever violated any term of the Agreement at any time or even acted in a manner that created an appearance of impropriety." Specifically, Mr. Zaid informed Cipriani that, prior to discussing any substance of the settlement negotiations with Lesar and Miller (who he identified as attorneys working with him in the representation of Michael Scott), Zaid had raised the issue with the DOJ attorney working on the *Scott* litigation, who explic-

**4**

itly stated that sharing information with co-counsel would not violate the confidentiality agreement.[1] Mr. Zaid stated his belief that the DOJ had spoken on behalf of the CIA, and that his discussions with Lesar and Miller were therefore proper. He also represented that both Lesar and Miller had agreed to abide by the terms of the confidentiality agreement. Nevertheless, he agreed not to discuss any more substantive issues from the negotiations with Mr. Lesar.

The *Scott* actions were finally settled in December of 1996. Under the terms of the settlement agreement, no provision was made for the release of the record destruction orders discussed on May 3, 1996.

Shortly after the settlement agreement had been reached, on January 22, 1997 Ms. Cipriani became aware of another disclosure of information by Mr. Zaid. This time Zaid had disclosed the existence of the record destruction orders to the General Counsel of the Assassination Records Review Board (ARRB), a congressionally created and presidentially appointed board with statutory responsibility for overseeing and coordinating the review and release of government records relating to the assassination of President Kennedy. In a letter dated January 22, 1997, Zaid responded to Ms. Cipriani's concerns, admitting that he had disclosed the information but again denying any wrongdoing. Rather than address the confidentiality agreement, however, Zaid stated that his actions did not violate the *settlement* agreement, and made no mention of the March 19, 1996 confidentiality agreement. In a January 23, 1997 letter, Cipriani clarified to Zaid that the CIA was concerned about a violation of the confidentiality agreement rather than of the settlement agreement, and she proposed that Zaid contact her immediately should he have any question in the future as to what information was covered by the confidentiality agreement. Zaid ac-

cepted that arrangement in a letter dated January 24, although as to the charge that he violated the confidentiality agreement he said only that he and the CIA had apparently "arrived at a point of disagreement on this issue."

Nearly one month before the disclosure to the ARRB General Counsel, by letter dated December 27, 1996, Mr. Zaid submitted a FOIA request to the CIA seeking, among other information, the record destruction orders discussed on May 3, 1996. That request was subsequently adopted in a FOIA request by the AARC (per its attorney, Mr. Zaid) dated July 28, 1997.[2]

In response to the FOIA requests seeking the record destruction orders, Ms. Cipriani again confronted Mr. Zaid in a letter dated February 4, 1998. Ms. Cipriani stated that the submission of the FOIA request allowed only two possibilities: (1) that Zaid, Miller, or Lesar had violated the March 19, 1996 confidentiality agreement or (2) that Michael Scott had violated the terms of his December 1996 settlement agreement. In a February 5, 1997 letter, Mr. Zaid "emphatically state(d)" that Mr. Scott had not breached his settlement agreement. He also once again denied any allegations that he had violated the March 19, 1996 confidentiality agreement. Zaid's explanation for the submission of the AARC's FOIA request was apparently that Mr. Lesar's personal professional knowledge as counsel in the *Scott* matter was "logically imputed" to the AARC, claiming that the request was not a violation of the confidentiality agreement.

The AARC's request led to the filing of this lawsuit, in which Mr. Zaid continues to represent the AARC. By motion filed March 3, 1998, the CIA has asked this Court to invoke its equitable powers and dismiss the AARC's action, on the basis that the existence of the information sought (the record destruction orders) was

---

1. The CIA apparently does not dispute this point.

2. A supplemental request was apparently submitted on October 10, 1997.

revealed to the AARC in violation of the *Scott* confidentiality agreement. Although dismissal is a remedy properly invoked only in rare circumstances, the unique policy issues raised by Mr. Zaid's brazen violations of the March 19, 1996 confidentiality render all other sanctions ineffective to protect the various interests at stake. Therefore, the CIA's motion will be granted, and the plaintiff's action will be dismissed with prejudice.

## II. LAW AND APPLICATION

The CIA's motion presents essentially two issues. First, was there a violation of the March 19, 1996 confidentiality agreement? Second, if so, is dismissal of plaintiff's action an appropriate remedy for that violation? Upon consideration of the record in this case and the unique policy concerns at issue, the Court will answer both of these questions in the affirmative.

### A. *Was there a violation of the confidentiality agreement?*

The CIA cites four instances in which it alleges that Mr. Zaid violated the March 19, 1996 confidentiality agreement. First, there is the discussion of substantive information with Messrs. Lesar and Miller. Second is the disclosure to the General Counsel of the ARRB. Third is the filing of Mr. Zaid's own FOIA request. Fourth, the CIA alleges that the AARC could only have known of the existence of the record destruction orders through a violation of the agreement either by Zaid or by Mr. Lesar. The AARC maintains that none of these incidents, the facts of which it appears generally not to dispute, constitutes a violation of the March 19, 1996 agreement. For the purposes of the CIA's motion to dismiss, the Court will evaluate these allegations of misconduct using a clear and convincing evidence standard. *See Shepherd v. American Broadcasting Co.,* 62 F.3d 1469 (D.C.Cir.1995) (requiring clear and convincing evidence of misconduct to support dismissal).

First, the CIA claims that Mr. Zaid's discussion of the substance of the spring 1996 settlement negotiations with Messrs. Lesar and Miller violated the confidentiality agreement. The CIA does not, however, appear to contest Mr. Zaid's assertion that he obtained the consent of the DOJ before discussing the substance of the negotiations with co-counsel. Given this, together with the representation that Messrs. Lesar and Miller agreed to be bound by the agreement, the Court cannot find that Zaid's discussions with them constitute a violation of the confidentiality agreement. The agreement explicitly permits discussion of the substance of the negotiations among counsel, and so long as Lesar and Miller were legitimately serving as Michael Scott's counsel (which the CIA has not disputed) Zaid was entitled to discuss the spring 1996 meetings with them.

A very different conclusion must be drawn from the CIA's second allegation. The AARC does not deny that the existence of the record destruction orders was disclosed to the General Counsel of the ARRB by Mr. Zaid around January of 1997. The ARRB's General Counsel was not serving as counsel to Michael Scott, and therefore he clearly was not included in the group of persons defined by the confidentiality agreement as permitted to discuss the substance of the negotiations— the parties and counsel. Instead, the AARC offers two other arguments why the disclosure to the ARRB General Counsel was not in violation of the confidentiality agreement; the AARC states (1) that the CIA had indicated that it would be willing, if necessary, to file declarations attesting to the existence of the record destruction orders with the court in the *Scott* action, and (2) that the CIA was under a statutory obligation to identify the orders and produce them either to the National Archives or the ARRB under the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Act), 44 U.S.C. § 2107.

As to the first of these arguments, the CIA's expressed willingness during

settlement negotiations to voluntarily disclose information, if necessary, cannot be interpreted as a signal to opposing counsel that they are free to divulge that information despite a binding confidentiality agreement. The fact is that the CIA never did disclose that information (until this action was brought, at which point the information was already available, due to Mr. Zaid's violations), and therefore the protections of the March 19, 1996 confidentiality agreement were not waived.

■ The AARC's second argument is also unpersuasive. The AARC apparently does not dispute the CIA's assertion that the record destruction orders were not responsive to the FOIA requests of Michael Scott, and therefore the CIA was under no obligation to produce them in the *Scott* litigation. And, as plaintiff concedes, the Court of Appeals has held that the JFK Act does not create a private cause of action. *See AARC v. DOJ*, 43 F.3d 1542 (D.C.Cir.1995). It is unclear, then, under what theory the AARC contends that the JFK Act justifies the disclosures of Mr. Zaid. The AARC simply alleges that the CIA attempted to "continue the concealment" of the orders "through the guise of a vague Confidentiality Agreement." Pl.'s Opp. to Mot. to Dismiss at 5–6. The alleged vagueness of the agreement is an unsuccessful argument which will be discussed below. The AARC's failure to address the substance of the CIA's allegations, however, seems in character with the AARC and Mr. Zaid's attitude toward the confidentiality agreement in general, which appears to be that one may violate it, pretend that it didn't happen, and then talk around the issue when confronted.

In any event, after the existence of the record destruction orders was wrongfully disclosed to the ARRB by Zaid, the ARRB contacted the CIA, was given access to the orders, and has designated them "assassination records" within the meaning of the JFK Act. To the Court's knowledge, they have not yet been disclosed to the public. However, in *AARC v. DOJ*, 43 F.3d 1542 (D.C.Cir.1995), the Court held that the JFK Act constituted "a 'comprehensive legislative scheme including an integrated system of procedures for enforcement.'" *Id.* at 1543. The Court of Appeals held that the JFK Act's statutory scheme does not permit private causes of action to enforce the Act, nor does it permit the district courts to apply the substantive standards of the JFK Act to FOIA actions. In light of that decision, the Court declines to lend its support to Mr. Zaid's efforts to act as a private enforcer of the Act's provisions by disclosing relevant information in violation of a confidentiality agreement. Whatever obligation the CIA may have had under the JFK, Act,[3] it cannot justify Zaid's violation of the March 19, 1996 agreement, an agreement which he signed voluntarily and the validity of which he has not challenged.

■ The third of the CIA's allegations asserts that Mr. Zaid's filing of a FOIA request for the record destruction orders was a violation of the confidentiality agreement. The AARC does not address this charge individually in its briefs, although it does argue generally that Zaid did not violate the March 19, 1996 agreement. Insofar as the AARC objects to this third contention on the general ground that the confidentiality agreement was vague, the Court will address that issue below. For present purposes, suffice it to say that in December of 1996, after the Scott settlement negotiations were completed, Mr. Zaid filed a FOIA request with the CIA specifically requesting the record destruction orders whose existence was revealed to him at the spring 1996 settlement meetings. The request was not submitted under seal, nor marked as confidential, nor otherwise denoted as containing privileged information. It is impossible to accept

---

3. The Court does not find that the CIA had such an obligation. The substantive standards of the JFK Act were not addressed in any detail by the parties, and resolution of the issue is not necessary to deciding the CIA's motion.

that Mr. Zaid in good faith believed that the orders were not covered by the March 19, 1996 confidentiality agreement, his vagueness arguments notwithstanding. The existence of the documents was revealed to him during confidential settlement negotiations; he had no other way of knowing about them. Apparently, having been allowed access to the information for the limited purposes of acting as counsel for Michael Scott, Zaid simply could not contain himself to abide by the confidentiality agreement and therefore personally requested the destruction orders under the FOIA. It is important to recognize that the information offered by the CIA during the *Scott* settlement negotiations was not offered for the benefit of Mr. Zaid, but for the benefit of his client, Michael Scott. It should go without saying that Zaid's use for personal benefit of confidential information obtained in his professional capacity raises serious questions about Mr. Zaid's adherence to the ethical standards of the legal profession. The Court is of the opinion that Mr. Zaid's filing of a FOIA request on his own behalf on the basis of the privileged *Scott* negotiations was in violation of the March 19, 1996 agreement.

▋ Finally, the CIA's fourth allegation is that the filing of the AARC's FOIA request must necessarily be the product of a violation of the confidentiality agreement by someone—Zaid, Lesar, or Miller—or perhaps a violation of the Scott settlement agreement by Scott himself. Zaid has adamantly denied that *Scott* violated the settlement agreement, and the CIA has chosen not to pursue this scenario. As there is no indication or allegation whatsoever that the CIA or its counsel may have disclosed the existence of the record destruction orders to the AARC, it is apparent that the plaintiff could have obtained this information only from Zaid, Lesar, or Miller.

Both the CIA and the AARC have focused entirely on Zaid and Lesar, and, finding no independent reason to believe that Miller may have disclosed any confidential information, the Court will also focus on the two people with most opportunity to disclose information to AARC—its president, Lesar, and its attorney, Zaid, both of whom learned of the existence of the record destruction orders in their capacities as counsel for Michael Scott. In a letter to Ms. Cipriani of the CIA dated February 5, 1997, Mr. Zaid made the unusual comment that Mr. Lesar's "personal" knowledge (gained, of course, in his professional capacity as Michael Scott's attorney in the *Scott* cases) was "logically imputed" to the AARC. Whether or not Mr. Lesar's knowledge of the record destruction orders was "logically" imputed to the AARC, the implicit argument that it was therefore legally imputed to the AARC would be laughable were it not so serious. Mr. Lesar became aware of the destruction orders solely as a result of settlement negotiations which he knew to be privileged and confidential, under a confidentiality agreement which he agreed to abide by. He learned this information, not in any individual capacity, nor as a representative of the AARC, but as Michael Scott's lawyer. The AARC cannot possibly argue that it is properly privy to all confidential or privileged information which Mr. Lesar may acquire in the course of practicing law; Mr. Lesar's clients (and the bar) would likely take issue with such a position. If Mr. Lesar did indeed disclose the existence of the record destruction orders, then he apparently fell victim to the same lack of self-control that appears to have overtaken Mr. Zaid; on many occasions, a lawyer may become aware of information that is interesting to him or her, or that would be useful to a client, or that he believes the public should have access to, etc., but which is nevertheless subject to the attorney-client privilege or, as in this case, to a confidentiality agreement. In these instances, the ethical canons and the law require that the attorney protect the confidential information, despite the temptations to the contrary. Messrs. Lesar and Zaid's failure to do so may be under-

standable on some level, but it is also a clear violation of the *Scott* confidentiality agreement.

■ Before moving to the issue of appropriate remedies, the court must address an argument offered by the AARC in response to the CIA's allegations generally, rather than to any specific charge. The AARC argues that the March 19, 1996 agreement is "vague and imprecise." Pl.'s Opp. at 8. In particular, the AARC argues that the language of the agreement suggests that the CIA's concern was with protecting the *terms* of a potential settlement agreement, rather than the content of the negotiation discussions. The existence of the records destruction orders was not and could not have been a term of the *Scott* settlement. So, the AARC's argument goes, the disclosure of that existence to persons other than the parties and counsel in *Scott* could not have violated the confidentiality agreement. This argument, however, fails.

First and most important, the language of the March 19, 1996 agreement is hardly ambiguous. The very first sentence states that "[t]he parties to the POIA lawsuit *Scott v. CIA*, 95–686, District Court for the District of Columbia, hereby agree to enter into *confidential and privileged settlement negotiations*." (Emphasis added.) The Court can see no ambiguity in those words. The agreement continues, "The parties agree that the nature and extent *of the discussions* concerning possible settlement will not be disclosed beyond the parties to the lawsuit and counsel without the consent of all parties." (Emphasis added.) Nowhere in the confidentiality agreement does the word "term" appear. On the contrary, it is clear to any reasonable reader of the March 19, 1996 agreement that the discussions and negotiations regarding possible settlement are to be maintained in confidence. The existence of the record destruction orders was revealed during, and only during, those discussions and negotiations, and so they clearly fall within in the scope of the agreement. The AARC's

argument to the contrary borders on bad faith.

In summary, the Court finds by clear and convincing evidence that the March 19, 1996 confidentiality agreement was violated on at least three occasions: by the disclosure to the ARRB's General Counsel, by the filing of Mr. Zaid's FOIA request, and by the disclosure to the AARC which led to the filing of the AARC's FOIA request. It is relevant to note, with regard to the clear and convincing standard of proof required under the Court of Appeals' case law, that the factual occurrences here are generally not disputed. The AARC does not assert that Zaid did not disclose the existence of the record destruction orders to the ARRB General Counsel (indeed they explicitly view it as a public service); nor does the AARC dispute that Mr. Zaid filed a FOIA request specifically identifying the record destruction orders; and finally, although the AARC does not explicitly concede that it learned of the destruction orders through Zaid or Lesar, its explanation regarding the "logical imputation" of Mr. Lesar's knowledge to the AARC is practically an admission. The AARC's argument that these actions nevertheless did not violate the confidentiality agreement is a legal argument, not a factual one, and it does not call into question the Court's findings that the predicate misconduct in this case—violations of the confidentiality agreement—have been established by clear and convincing evidence.

B. *Is dismissal of AARC's action an appropriate remedy for the violations of the confidentiality agreement?*

■ Having found by clear and convincing evidence that Mr. Zaid did indeed violate the March 19, 1996 confidentiality agreement, and further that the AARC's FOIA request in this action is the product of a violation of that agreement either by Zaid or Lesar, the next issue for the Court's consideration is whether dismissal

of the AARC's action is an appropriate remedy for those violations. After a careful weighing of the various factors at issue and the Court of Appeals' case law, and for the reasons set forth below, the Court finds that dismissal is appropriate in this case.

The law of this circuit on the inherent power of courts to dismiss actions for misconduct is based largely on the Court of Appeals' decision in *Shepherd v. American Broadcasting Co.*, 62 F.3d 1469 (D.C.Cir. 1995). There the Court of Appeals held that

> a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence ... that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.

*Id.* at 1472. In particular, the Court of Appeals required that district courts, before imposing a sanction of default or dismissal, must provide a "specific, reasoned explanation for rejecting lesser sanctions, such as fines, attorneys' fees, or adverse evidentiary rulings." *Id.* at 1478. Although the court of Appeals was careful to state that the district court need not exhaust other lesser remedies before dismissing or defaulting a party for misconduct, *see id.* at 1479, it admonished the district court to "carefully balance the policy favoring adjudication on the merits with competing policies such as the need to maintain institutional integrity and the desirability of deterring future misconduct," *id.* at 1478 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989).

The Court of Appeals elaborated on the *Shepherd* analysis last year in *Webb v. District of Columbia*, 146 F.3d 964 (D.C.Cir.1998). There, the Court of Appeals relied heavily on its 1986 decision in *Shea v. Donohoe .Construction Co.*, 795 F.2d 1071 (D.C.Cir.1986), to explain the various factors that a district court should weigh before dismissing a case for misconduct.

In *Shea*, the Court of Appeals set forth three general justifications for dismissing an action based on misconduct, particularly that of counsel: prejudice to the other party, prejudice to the judicial system, and deterrence and punishment. As to the first of these justifications, the Court of Appeals reviewed several cases in which dismissal of an action had been held appropriate because the misconduct of one party's counsel prejudiced the other party "so severely as to make it unfair to require the party to proceed with the case." *Id.* at 1074. The Court of Appeals held, in those circumstances, that dismissal may be appropriate regardless of whether the misconduct was by the party or by its counsel, *see id.*, so long as other less drastic sanctions had proven ineffective or would obviously prove futile, *see id.* at 1075. With regard to the second justification, prejudice to the judicial system, the Court of Appeals held that "[w]here the delay or misconduct would require the court to expend considerable judicial resources in the future in addition to those it has already wasted, thereby inconveniencing many other innocent litigants in the presentation of *their* cases, our precedents have held that dismissal may be an appropriate exercise of discretion." Again in this context, the Court of Appeals noted that the propriety of the dismissal "need not turn on the level of the client's—as opposed to the counsel's—complicity." *See id.* at 1076. Third, with respect to the justification of deterrence and punishment, the Court of Appeals found the district court's interests in sanctioning disrespectful conduct and deterring future misconduct to be legitimate goals that, when exercised with due care, could support a dismissal. Unlike the justifications based on prejudice, however, the Court of Appeals found that dismissal of an innocent party's action based solely on the misconduct of the party's attorney would rarely be warranted. However, while careful to protect the legitimate interests of innocent parties, the Court of

Appeals stated that "[w]hen the client is aware, or should be aware, of his attorney's misconduct, it is not unjust to penalize him."

Applying the analysis set forth in *Shepherd*, and then clarified in *Webb* by reference to *Shea*, the Court finds that dismissal of the plaintiff's action is warranted, because any lesser sanction would allow the AARC and its counsel to profit from what is essentially a "Rambo" litigation tactic. Each of the *Shea* justifications is directly implicated in this case, and, after careful review, the Court finds that ordinary sanctions including attorneys' fees and adverse evidentiary findings would be insufficient to protect the interests of the Court, the judicial system, the defendant, and other defendants who are or may be similarly situated.

To begin with, it is apparent that the CIA has been severely prejudiced by the wrongful disclosures of Zaid. In the *Scott* litigation, the CIA entered into good faith negotiations with Michael Scott to settle his FOIA lawsuit. To facilitate open discussion and permit it to disclose as much as possible to the plaintiff, while still protecting its legitimate interests, the CIA proposed a confidentiality agreement, which was then signed by all parties and their counsel, including Zaid. The binding nature of that agreement on Zaid has not been challenged, and it represents a valid, enforceable contract between the signatories. Nevertheless, knowing full well that the CIA intended the existence of the record destruction orders to be kept secret, and having contracted to maintain that information in confidence, Zaid wrongfully disclosed the information on several occasions and has now filed this FOIA request on behalf of the AARC. By doing so, he has forced the CIA to defend this litigation, and he has disclosed privileged information that, once revealed, can obviously never be "un"-disclosed.

More severe than the prejudice in this particular action, however, are the ramifications of Zaid's actions to other affairs of the CIA and other agencies, a prejudice which also adversely affects the entire judicial system. Were the AARC's FOIA action to survive, it would signal to the nation that any confidentiality agreement entered into with the federal government would be a meaningless piece of paper, because the other parties to the agreement could simply file requests for the "confidential" information under the FOIA. This is, in essence, what Zaid and the AARC have done here. As counsel for Michael Scott, Zaid voluntarily signed a confidentiality agreement with the CIA. In reliance on that agreement, the CIA discussed certain information in Mr. Zaid's presence that was intended to remain privileged. Zaid, then, after the *Scott* settlement had been completed, submitted a FOIA request on his own behalf and also apparently disclosed the information to the AARC and submitted a request on its behalf. Were the Court to permit AARC to go forward, it would be obvious to the CIA and every other federal agency, as well those in litigation with the agencies, that confidentiality agreements with an agency would be effectively unenforceable. The consequence would necessarily be an unwillingness on the part of the agencies to enter into confidential settlement negotiations, which would in turn increase the number of disputes that must be decided by the courts. Obviously, there is a strong interest in promoting good faith settlement negotiations between federal agencies and other parties, and this interest is shared by the courts as well.

Finally, this case presents a scenario in which deterrence and punishment are particularly necessary. As explained above, Mr. Zaid has violated the March 19, 1996 confidentiality agreement, and this misconduct will have widespread repercussions for FOIA and other litigation against the agencies. For this reason, deterrence of similar conduct in the future is crucial. It is also apparent from the record that Zaid violated the confidentiality agreement repeatedly and brazenly. The CIA raised

concerns with him about improper disclosures on a number of occasions spanning many months. Mr. Zaid, although he maintained throughout that he had committed no violation, even professed a willingness to pay more attention to the agreement and to take special care to avoid the appearance of impropriety. Despite these representations, and despite the concern of the CIA, he wrongfully disclosed information to the ARRB General Counsel and then filed FOIA requests on his own behalf and on behalf of his client, AARC. It is therefore clear that warnings have no deterrent effect on Mr. Zaid, and it also clear that his improper behavior deserves serious sanctions by this Court.

The Court of Appeals, however, has explicitly held that the conduct of counsel alone, without the actual or constructive knowledge of the client, will very rarely warrant dismissal. *See id.* at 1077. It is therefore necessary to examine the complicity of the AARC in the filing of this FOIA action. First, this is not a case where a lawyer engages in misconduct during the course of ongoing litigation without any knowledge on the client's part. On the contrary, it was a violation of the confidentiality agreement which precipitated the AARC's filing the request at issue in this action. The Court must presume that the AARC was aware of Zaid's filing of the request on its behalf, as well as of the filing of this subsequent lawsuit. Second, the AARC either did know or at the very least should reasonably have known that the existence of the record destruction orders was disclosed in violation of a confidentiality agreement. Mr. Lesar was aware of the existence of the orders through his participation in the *Scott* litigation, and he was further aware that the settlement negotiations in which their existence was revealed were subject to a confidentiality agreement. As the AARC's president, Lesar was most certainly aware that the information being requested on the AARC's behalf was the same information which had been shared by the CIA

with Michael Scott in the spring 1996 settlement discussions, which he knew to be privileged. Under the particular circumstances of this case, to pretend that the AARC was somehow ignorant of the actions of its counsel and its president would be a gross error and would work a real injustice on the CIA and the courts.

Finally, the Court is conscious of the Court of Appeals' insistence that dismissal is a " 'sanction of last resort,' to be used only when less onerous methods (for example, adverse evidentiary determinations or other 'issue-related sanctions') will be ineffective or obviously futile." *Webb,* 146 F.3d at 971. This is clearly such a case. In some sense, dismissal of the AARC's case is in fact an "issue-related" sanction. This FOIA action is not like an employment discrimination case, or a personal injury action, or any other lawsuit in which the plaintiff seeks remedy for various wrongs often under a number of legal theories. In such a case, dismissal of the entirety of the plaintiff's case based on misconduct that is unrelated or tenuously connected to the merits of the case is properly considered a drastic result. In this action, on the other hand, the merits of the AARC's FOIA action are substantially intertwined with the issue now before the Court. In its action, the plaintiff seeks just one thing—documents—under just one legal theory—FOIA, and it so happens that it seeks these documents because it learned of them through the violation of the *Scott* confidentiality agreement. The record destruction orders are the issue in this case, and they are also the subject of the misconduct by Zaid, Lesar, and the AARC. So, practically speaking, dismissal of the AARC's action *is* "issue-related," as that term is used in the Court of Appeals' case law.

This same circumstance illustrates why lesser sanctions will be ineffective to protect the interests of the CIA and the judicial system and futile efforts at punishment and deterrence. For example, the

Court could assess attorneys' fees against the AARC or against Zaid; but the AARC would nevertheless obtain the benefit of the violations of the confidentiality agreement by forcing the CIA to produce the record destruction orders, and the ramifications for agency willingness to participate in settlement negotiations would be tremendous. Perhaps the Court could simply rule that the CIA was lawfully entitled to withhold the orders; even then the agency would be forced to declare their existence, which was itself revealed in clear violation of the March 19, 1996 confidentiality agreement. Because the object of both the confidentiality agreement and this and all FOIA requests and litigation is information, only a remedy which neutralizes the information wrongfully disclosed and which does not permit anyone involved to benefit from the wrongful disclosure is adequate to serve the interest of justice and deter this kind of improper litigation tactic in the future.[4] Any lesser response from the courts will almost certainly have weighty and undesirable consequences on the willingness of agencies to discuss settlements in litigation. This will injure the agencies and the courts, and furthermore it will create a barrier to the core objective of the FOIA, which is a government as open as possible to its constituents.

## III. CONCLUSION

In conclusion, the Court finds by clear and convincing evidence that Mr. Zaid and

Mr. Lesar violated the March 19, 1996 *Scott* confidentiality agreement, and that these violations precipitated the filing of the AARC's FOIA request and subsequently this lawsuit. Having weighed the many relevant factors and examined the particular circumstances of this case, in light of Court of Appeals precedent, the Court finds that no remedy short of dismissal can remedy the prejudice caused to the CIA and the judicial system nor accomplish the necessary punitive and deterrent functions required by the nature of the violations in this case and the important policy concerns implicated. Therefore, and for all of the reasons stated above, the Court will grant the CIA's motion to dismiss.

## MEMORANDUM OPINION

April 30, 1999.

This matter is again before the Court, now on a motion by the plaintiff for reconsideration of the Court's February 5, 1999 order dismissing the action for repeated and brazen violations of a confidentiality agreement by the plaintiff's attorney, Mark Zaid. Now represented by new counsel for the purpose of this motion, plaintiff asks the Court to condone the misconduct of Zaid and of the plaintiff itself and reinstate the dismissed action. Because the

4. In this regard, the plaintiff argues that the FOIA request at issue in this case is actually broader than simply a request for the record destruction orders, because it also requests copies of Winston Scott's manuscripts and "all other documents that were withheld ... which were the subject of litigation ... in *Scott v. CIA et al.*" Compl. ¶ 5. What Zaid and Lesar have done is this: As attorneys for Michael Scott, they negotiated and agreed to a settlement in which Scott would drop his action against the CIA in exchange for certain information. Under that settlement, it was agreed that some documents would be withheld by the CIA. Zaid and the AARC (of which Lesar is president) then proceeded to file FOIA requests seeking *precisely and explicitly* the documents that were withheld under the *Scott* settlement agreement negotiated by Zaid

and Lesar. This is a grossly improper action by two attorneys, and if they were intending this action at the time of the settlement, then the CIA would likely by entitled to invalidate that agreement. Of course, though, by the very nature of the *Scott* case, the consideration given by the CIA to Scott was information, which cannot now be "given back." Any sanction less than dismissal of this action would be futile, and it would render the December 1996 settlement agreement, as well as the March 19, 1996 confidentiality agreement, utterly hollow. Even more dangerous, it would signal to all federal agencies and those in litigation with them that all settlement agreements and confidentiality agreements would be vulnerable to such abuse by unscrupulous attorneys.

plaintiff has raised no legitimate ground whatsoever for reconsideration, the Court will deny the motion.

## I. FACTS

The factual background of this case is set out in detail in the Court's memorandum opinion of February 5, 1999, and the Court will not needlessly repeat it here. A brief review of the major points, however, will place the plaintiff's motion in the appropriate context.

This dispute has its roots in a separate FOIA lawsuit before another judge of this Court, in which Mr. Zaid represented the plaintiff, Michael Scott, in his lawsuit against the Central Intelligence Agency (CIA) to recover documents pertaining to his father, Winston Scott, Chief of Station of the CIA's Mexico City office at the time of Lee Harvey Oswald's visit there in 1963. In his capacity as plaintiff's counsel in that lawsuit, Mr. Zaid signed a confidentiality agreement in which he agreed not to disclose information disclosed by the CIA during settlement negotiations.

In a memorandum opinion issued February 5, 1999, this Court found by clear and convincing evidence that Mr. Zaid violated that confidentiality agreement on at least two and likely three occasions. The last of those occasions, in which it could not be conclusively determined whether it was in fact Mr. Zaid or the AARC's president James Lesar who violated the confidentiality agreement, was the basis of the FOIA action that this Court dismissed in February and which the plaintiff now seeks to have reinstated. On the basis of those findings, the Court dismissed plaintiff's action.

## II. DISCUSSION

 As this Court has held before, a "motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled ... A court will grant a motion to reconsider only if the moving party can present new facts or clear errors of law that 'compel' a change in the court's prior ruling." *Amoco Prod. Co. v. Fry*, 908 F.Supp. 991, 994 (D.D.C.1995), *rev'd on other grounds*, 118 F.3d 812 (1997); *see also AARC v. DOJ*, 828 F.Supp. 100, 101–02 (D.D.C.1993); *Methodist Hospital of Sacramento v. Shalala*, 1993 WL 128491, at *1 (D.D.C.1993). Plaintiff has fallen well short of satisfying this standard.

In support of its motion for reconsideration, plaintiff challenges just one factual statement in the Court's twenty-six page opinion and makes no effort to dispute the Court's findings that Mr. Zaid (and possibly Mr. Lesar) violated the confidentiality agreement repeatedly and brazenly, in such a manner as to show contempt for the defendant, defense counsel, the law, and the legal system. Rather than dispute these findings, plaintiff asks the Court to condone Zaid's and the AARC's misconduct and reinstate the action based on arguments that were not raised before the Court's February 5, 1999 order and which are, furthermore, baseless. Plaintiff even goes so far as to suggest, through the sworn testimony of a law professor, that reinstatement of its action is compelled by "public policy." The Court takes issue both with the plaintiff's arguments and with the manner in which they are presented.

To begin with, the opening page of the memorandum in support of plaintiff's motion for reconsideration attempts to minimize the significance of the Court's February 5, 1999 decision by referring to the Court's *"initial* findings." (Emphasis added.) The Court's findings that Zaid violated the confidentiality agreement were made on clear and convincing evidence and were deemed, after rigorous consideration by this Court, to require the severe remedy of dismissal. Plaintiff's attempt to pretend like those findings were never made or were made without due consideration only reinforces the necessary conclusion that dismissal is an appropriate remedy in this case. Just as Mr. Zaid repeatedly

14

ignored, denied, or minimized the concerns of defense counsel when questions were raised as to whether Zaid was violating the confidentiality agreement, plaintiff now chooses to ignore or minimize this Court's findings (although, curiously, it does not deny them).[1]

Moving on to more substantive issues, the Court will address each of plaintiff's suggested grounds for reconsideration. First, plaintiff now argues that equitable dismissal of the action was improper because the CIA had "unclean hands" from alleged misrepresentations and unlawful document destruction. This argument was not raised in plaintiff's opposition to the motion to dismiss, and plaintiff has made no attempt to explain why it was not raised earlier nor why the Court should reopen this case to entertain arguments that could and should have been raised before the case was dismissed with prejudice. In any event, as the Court will explain in more detail below, even if the plaintiff were able to prove misconduct on the part of the CIA, it could not justify the plaintiff's own misconduct and that of Mr. Zaid. The doctrine of unclean hands does not stand for the proposition that two wrongs make a right.[2]

■ Plaintiff's second argument borders on the preposterous. Plaintiff argues that the confidentiality agreement should be deemed null and void as against public policy because the CIA "misled [Mr. Zaid] into signing a confidentiality agreement that had an improper purpose, one designed to defeat justice and cover-up misrepresentations by the CIA." Pl.'s Memo. Supp.Mot. for Reconsid. at 19. In addition to the plaintiff's failure to present the Court with any credible evidence of such an intent on the part of the CIA,[3] plaintiff seems to harbor a serious misconception about the "public policies" at issue in this case. There can be no dispute that, as plaintiff asserts, there is a strong and well recognized public policy in favor of transparency of government and the prevention of corruption. However, it is hard to see how this interest can render invalid a facially ordinary confidentiality agreement without some evidence that the agreement suffers from a defect in its purpose or formation. More important, the plaintiff ignores entirely the other significant policies supporting dismissal of this case. For instance, the courts have a strong interest in supporting the out-of-court resolution of cases through settlement; this furthers economy of judicial and private resources, and it allows the parties to have the maximum control over the resolution of their disputes. Confidentiality agreements play an integral role in settlement in many circumstances, particularly in the FOIA

1. Another telling example of this attitude is plaintiff's assertion that Mr. Zaid's fault, if any, was his "mistake in permitting his relative inexperience at the time to be taken advantage of by the CIA." P.'s Memo.Supp.Mot. For Reconsid. at 1–2. Despite this assertion of "inexperience," plaintiff includes as an attachment to its motion a nine-page curriculum vitae of Zaid, detailing his education, experience, academic positions, professional associations, board positions, notable cases, and fully five pages of published articles dating from before the time of the *Scott* litigation up to the present. Much of this experience appears to be in the FOIA context. Suffice it to say that the Court finds this information to diminish the credibility of plaintiff's "inexperience" excuse.

2. Similarly, plaintiff's argument that the CIA should not be allowed to use a confidentiality agreement to cover up unlawful behavior misses the point. If Mr. Scott was dissatisfied with the CIA's handling of his case and settlement, including confidentiality issues, he could have moved for relief from the settlement based on the CIA's alleged misconduct. Likewise, if Mr. Zaid had felt compelled to reveal CIA misconduct concerning matters covered by the confidentiality agreement, he could have notified the Court or taken any of several other steps to see that the law was rightly enforced—instead, he opted to himself violate the confidentiality agreement.

3. The CIA roundly denies having had such a purpose in entering into the agreement, *see* Decl. of R. Caudle at 3–4, and no such motivation is apparent on the face of the document.

context and even more obviously in litigation with those government agencies that routinely handle sensitive information, such as the CIA. As the Court discussed more fully in its February 5, 1999 opinion, to permit FOIA litigants (or their attorneys) from end-running confidentiality agreements by filing FOIA requests for information obtained in confidence would necessarily result in "an unwillingness on the part of the agencies to enter into confidential settlement negotiations, which would in turn increase the number of disputes that must be decided by the courts." Memo.Op. of February 5, 1999, at 21.

There is also an important interest under these circumstances in discouraging the kind of misconduct engaged in by Zaid. Seen in the light most favorable to plaintiff, Zaid's violations of the confidentiality agreement were acts of improper "self-help" which should be discouraged by the courts in favor of appropriate avenues for reporting concerns of misconduct. Seen more realistically, however, Zaid's conduct represents a conscious effort to circumvent the confidentiality agreement and wrongfully benefit from information obtained in confidence and in his role as a member of the Bar and officer of the Court. Given the complicity of the plaintiff, at least with regard to the filing of the FOIA request and action at issue here, dismissal of the action was and is the only appropriate remedy to ensure that the plaintiff does not wrongfully benefit from such egregious and calculated misconduct.

In sum, plaintiff's weighing of the public policies at issue in this case is skewed. The opinion of Professor Blakey notwithstanding, there are policies at stake more important and more broad than the interest in preserving records relating to the assassination of President Kennedy for "historical and governmental purposes." Decl. of G. Blakey at 7 (quoting President John F. Kennedy Records Collection Act of 1992, 106 Stat. 3443, § 2(a)). The interest in promoting fair and efficient resolution of disputes lies at the heart of the judicial function, and that very interest in this case compels dismissal of plaintiff's FOIA action.

## III. CONCLUSION

 The crucial factor in this case remains the gross misconduct of Mr. Zaid and perhaps Mr. Lesar, with the complicity of the AARC on at least one occasion. The entirety of plaintiff's argument for reconsideration is based on allegations of misconduct by the CIA in the prior *Scott* litigation. What plaintiff apparently fails to comprehend is that, even if the Court were to find that the CIA made material misrepresentations and illegally destroyed documents,[4] such action by the CIA could not possibly justify the "self-help" measures invoked by Zaid and the AARC. If Michael Scott had or has concerns that the CIA behaved improperly or unlawfully in connection with his case before Judge Richey, the appropriate remedy might be to move to reopen that case or to move for relief from the terms of the settlement reached there. Likewise, if Mr. Zaid had felt that the confidentiality agreement improperly constrained him in his duty to report wrongdoing to the appropriate authorities, he could have raised those concerns at any stage with the CIA. If uncomfortable with that option, he could have addressed his concerns to the United States Attorney or to any local or federal law enforcement agency. Mr. Zaid, however, raised no such concerns to anyone at any time. Instead, apparently unable to resist the temptation of disclosing confidential information, and unconcerned about the ramifications of such improper disclosure for his clients, Mr. Zaid violated the agreement not once, but two times at least, possibly three times, despite the ongoing objections of defense counsel. Such bald disregard of the law and professional standards of conduct is rarely if ever justified, and certainly it was not in this case.

4. The Court makes no such finding today.

**16**

Under the circumstances, the Court simply cannot believe that Mr. Zaid's actions were some kind of noble civil disobedience; to the contrary, they were highly improper and clearly unethical.

For the reasons set forth above, the plaintiff's motion for reconsideration will be denied.

A separate order will issue this date.

*ORDER*

Upon consideration of plaintiff's motion for reconsideration, defendant's opposition, plaintiff's reply, and the record in this case, and for the reasons set forth in the memorandum opinion issued this date, it is hereby

ORDERED that the motion for reconsideration is DENIED.

SO ORDERED.